UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

WALTER SCHIK,

Defendant,

Case No. 20 Civ. 2211 (MKV)

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Robert S. Fink
Juliet L. Fink
KOSTELANETZ & FINK, LLP
Seven World Trade Center, 34th Floor
New York, NY 10007
(212) 808-8100 (phone)
(212) 808-8108 (fax)
Email: jfink@kflaw.com
*Attorneys for Defendant Walter Schik*

# TABLE OF CONTENTS

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. THE LIFE OF WALTER SCHIK ..... 2

A. The Early Years of Walter Schik ..... 2

B. The Adult Years of Walter Schik ..... 4

II. WALTER SCHIK'S FOREIGN BANK ACCOUNTS ..... 4

A. The Establishment of Walter Schik's Foreign Accounts ..... 4

B. The Management of Walter Schik's Foreign Accounts ..... 5

C. The UBS Bank Records ..... 6

III. THE PREPARATION OF WALTER SCHIK'S TAX RETURNS ..... 6

ARGUMENT ..... 7

I. SUMMARY JUDGMENT STANDARD ..... 7

II. STANDARD OF REVIEW ..... 8

III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER OR NOT WALTER SCHIK'S FAILURE TO FILE THE FBAR WAS WILLFUL ..... 9

A. Willfulness is Defined as the Intentional Disregard of a Known Legal Duty and Should Not Include Recklessness ..... 9

B. Even Applying the "Reckless Disregard" Definition of Willfulness, There is Still a Genuine Issue Regarding Whether or Not Walter Schik was Willful ..... 11

IV. THE IRS VIOLATED THE APA IN DETERMINING THE AMOUNTS OF PENALTIES ..... 14

V. THE PROPOSED 50% FBAR PENALTY VIOLATES THE EIGHTH AMENDMENT OF THE U.S. CONSTITUTION ..... 15

CONCLUSION ..... 16

## TABLE OF AUTHORITIES

### CASES

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) .......... 8

*Anderson v. Liberty Lobby,* 477 U.S. 242 (1986) .......... 8

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .......... 7

*Cheek v. United States*, 498 U.S. 192 (1991) .......... 10

*Lefcourt v. United States*, 125 F.3d 79 (2d 1997) .......... 10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) .......... 8

*Ratzlaf v. United States*, 510 U.S. 135 (1994) .......... 9, 10

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007) .......... 11

*Scott v. Harris,* 550 U.S. 372 (2007) .......... 8

*United States v. Bajakajian*, 524 U.S. 321 (1998) .......... 15

*United States v. Clemons*, No. 18-CV-258, 2019 WL 7482218 (M.D. Fla. Oct. 9, 2019) .......... 10

*United States v. de Forrest*, 463 F.Supp.3d 1150 (D. Nev. 2020) .......... 10

*United States v. Flume*, No. 16-CV-73, 2018 WL 4378161 (S.D. Tex. Aug. 22, 2018) .......... 9, 11, 14

*United States v. Gentges,* No. 18 Civ. 7910 (KMK), 2021 WL 1222764 (S.D.N.Y. Mar. 31, 2021) .......... 12, 13

*United States v. House*, 524 F.2d 1035 (3d Cir. 1975) .......... 14

*United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012) .......... 11, 12, 13

*United States v. Pomponio*, 429 U.S. 10 (1976) .......... 9

*United States v. Williams,* 489 F. App'x 655 (4th Cir. 2012) .......... 12, 13, 14

*Valetti v. Commission of Internal Revenue*, 260 F.2d 185 (3d Cir. 1958) .......... 8

### STATUTES

31 U.S.C. § 5321 .......... 14

## OTHER AUTHORITIES

I.R.S. C.C.A. 2006-03-026 (Jan. 20, 2006) ........................................ 8

IRM 4.26.16.5.5.2(3)(f) (June 24, 2021) ........................................ 8

IRM 4.26.16.6.5 ........................................ 14

## CONSTITUTIONAL PROVISIONS

U.S. CONST. AMEND. VIII........................................ 15

## INTRODUCTION

Defendant Walter Schik ("Mr. Schik" or the "Defendant") hereby opposes the Motion for Summary Judgment filed by the government because there are numerous disputed issues of material fact in this case. The origination of Mr. Schik's foreign bank accounts was not the nefarious scheme portrayed in the government's brief, and the facts and circumstances present in Mr. Schik's case are readily distinguishable from the cases cited by the government. Mr. Schik was born and grew up in eastern Europe before immigrating to the U.S. after experiencing the horrors of the Holocaust. This deeply traumatic experience has affected Mr. Schik's entire life and, as relevant in this case, he justifiably believed that it was important to always maintain some funds in Switzerland, a neutral country during World War II, so that they could be accessed in the event of further religious persecution or some other catastrophe. This was Mr. Schik's sole intent when he established the foreign accounts at issue; there was no intent to evade U.S. tax or reporting obligations. After the accounts were opened, Mr. Schik relinquished almost all control over the accounts to a local asset manager, David Beck, and he did not participate in investment decisions and did not have any understanding about how Mr. Beck structured the accounts. Mr. Schik, who lacks almost any formal education, had no knowledge concerning the offshore asset reporting requirements of U.S. taxpayers; his accountant during the relevant time period did not advise him concerning foreign accounts; and Mr. Schik did not believe that it was necessary to discuss non-U.S.-based accounts with his accountant. As soon as Mr. Schik became aware of his reporting obligations, he applied to the IRS's Offshore Voluntary Disclosure Program ("OVDP") and, even after he was inexplicably rejected from the OVDP, he nevertheless proceeded to file amended tax returns (and thereby incriminated himself and exposed himself to criminal prosecution) and pay back tax and interest on the income from his foreign accounts. These

factors raise numerous questions of fact with regard to Mr. Schik's knowledge and intent. Therefore, summary judgment should be denied.

## FACTUAL BACKGROUND

### I. THE LIFE OF WALTER SCHIK

#### A. The Early Years of Walter Schik

Mr. Schik was born one of six children to hard-working Jewish parents in Vienna, Austria in 1930. (Fink Decl. Ex. A. ("Schik Affidavit") ¶ 3; Ex. G ("Rule 56.1 Counter-Statement") ¶ 61.) His earliest memories are against the backdrop of a dictatorship which supported and advanced an inhumane and morally bankrupt ideology which engaged in the extermination of millions of Jews and Jewish sympathizers. As a result, in 1938, the Schik family, who were practicing Jews, abandoned all of their possessions and their friends, and fled from Austria to Hungary in an attempt to avoid religious persecution. (Schik Affidavit ¶ 4.) The family remained in Hungary until Hitler's occupation of that country in 1944.

At that time, at the age of only thirteen, the Nazis forcefully separated Mr. Schik from his family. Mr. Schik was sent to a concentration camp near Budapest; his parents, his four brothers and his sister were sent to Auschwitz, in Poland. (Schik Affidavit ¶ 5; Rule 56.1 Counter-Statement ¶ 61.) After a few months in the concentration camp near Budapest, Mr. Schik was one of three boys in the camp released as a result of a deal struck between the Nazis and a wealthy and influential Jewish business owner whose two young sons had been abducted from a school bus and placed in the same concentration camp. The wealthy business owner did not want the identity of his sons known to either the Nazis or others in the camp, and as a result, he arranged for all minors under the age of fourteen to be released from the camp. The other two boys released were also just thirteen years old. (Schik Affidavit ¶ 6.)

Once released, Mr. Schik traveled alone by foot to find shelter with a relative near Budapest. Mr. Schik lived with this relative until they were both rounded up by the Nazis and marched to Austria. The journey was long and hazardous. All Jews traveled by foot, and Mr. Schik witnessed the deaths of many en route. Mr. Schik secretly removed the yellow Star of David from his coat, the symbol which indicated the bearer was Jewish, and broke ranks to escape. If discovered, Mr. Schik would have been immediately shot. (Schik Affidavit ¶ 6.)

After his successful escape, Mr. Schik was discovered by an older gentleman who he later learned was a Jewish man with forged gentile papers. The man gave Mr. Schik some money and food, and advised him of a safe place to hide in Budapest. After walking back to Budapest, Mr. Schik learned that his parents and three of his siblings had all been murdered in Auschwitz. (Schik Affidavit ¶ 7.)

After the war ended, Mr. Schik planned to go to Belgium and tried to travel there through France but was stopped and detained by Strasbourg police. The police placed Mr. Schik in a UJA orphanage in Strasbourg, France. (Schik Affidavit ¶ 8.) While in the orphanage, Mr. Schik met a Yeshiva group that was en route to the United States. One of the boys traveling with the group changed his mind and decided to remain in Europe. Mr. Schik secured the opportunity to travel to the United States with the Yeshiva group by obtaining the identification papers of that boy, and traveled to the United States under the name Moses Weisner. (Schik Affidavit ¶ 9.)

Like many other survivors, Mr. Schik's experience during this dreadful and tragic period of history resulted in what is commonly referred to as a "Holocaust mentality" – often manifested by a real and intense fear of future discrimination or persecution together with a need for an ability to flee with one's family almost instantly should it be perceived that the world is, once again, becoming treacherous for Jews. As noted above, Mr. Schik's experience during the

Holocaust has shaped his entire life, and his entire way of thinking. These beliefs prompted many survivors, including Mr. Schik, to conclude that it was essential to establish secret "nest eggs" should such a need arise. These are the facts that led Mr. Schik to establish and maintain bank accounts in Switzerland. (Schik Affidavit ¶ 15; Rule 56.1 Counter-Statement ¶ 64.)

### B. The Adult Years of Walter Schik

Mr. Schik immigrated to the United States in 1947 when he was just sixteen years old. (Kraemer Decl. Ex. D. ("Schik Depo.") 10:7-11; Rule 56.1 Counter-Statement ¶ 61.) Mr. Schik received little formal education when he grew up in Europe, never advancing past elementary school, and he received no education whatsoever in the United States. (Schik Depo. 10:12-12:13; Rule 56.1 Counter-Statement ¶ 62.) Mr. Schik's first job was as an errand boy in a men's tie store in New York City. (Schik Depo. 13:21-14:14.) A year later, he found a better job as a tie presser in another New York tie store. (Schik Depo. 14:14-14:25.) Over time, Mr. Schik worked his way up to becoming a cutter, cutting neckwear. (Schik Depo. 14:15-16:4.) Ultimately, Mr. Schik was able to buy his own tie company, which he owned and operated up until his retirement approximately 10 years ago. (Schik Depo. 16:7-17:12; 22:13-22). Mr. Schik was never involved in managing the financials of his tie company – that was the responsibility of his partner. (Schik Depo. 19:18-19.) Mr. Schik's responsibility within the company was selling the ties. (Schik Depo. 21:6-8.) Indeed, throughout his whole adult life, Mr. Schik has been a simple tie salesman.

## II. WALTER SCHIK'S FOREIGN BANK ACCOUNTS

### A. The Establishment of Walter Schik's Foreign Accounts

Mr. Schik became a U.S. citizen in or around 1957. (Schik Depo. 9:24-25.) Just a few years later, in or around the 1960s, Mr. Schik first opened his Swiss account with funds that he inherited in Europe from his family's estates as one of the sole survivors of the Holocaust.

Indeed, ***all*** of the monies that were deposited into Mr. Schik's Swiss bank accounts were derived from the estates of Jewish family members who perished in the Holocaust; none of the monies in the accounts came from his business or his work in the United States (Schik Affidavit ¶ 14; Rule 56.1 Counter-Statement ¶ 63; Fink Decl. Ex. B); this is a far cry from the typical offshore banking case, where secret accounts are used to skim cash profits and avoid tax. It is also critical to observe that, during the entire time Mr. Schik had bank accounts overseas, his money was managed by David Beck, an asset manager based in Switzerland and, later, by David Beck's son, Josef Beck, who took over his father's business (collectively, the "Becks"). Mr. Schik completely entrusted his overseas funds to the Becks and their staff.

**B. The Management of Walter Schik's Foreign Accounts**

Mr. Schik vested the Becks with unilateral authority to manage the accounts and they did whatever they deemed best. (Schik Affidavit ¶ 16; Rule 56.1 Counter-Statement ¶ 65.) For example, Tivka Consulting, an entity viewed suspiciously by the government as evidence of Mr. Schik's willful state of mind, was merely a company that the Becks established on Mr. Schik's behalf to hold his money. Mr. Schik did not direct the Becks to set up Tikva Consulting, he had no input into how it was formed, and he did not manage the company in any way. (Schik Affidavit ¶ 17.)

It is now widely understood that the Becks provided similar asset management services for other American taxpayers and often had unfettered discretion as to how clients' funds were managed. Indeed, in 2012, approximately three years after Mr. Schik attempted to make a voluntary disclosure of his foreign bank accounts to the IRS (which, as noted above, was rejected for reasons which the government has never explained), federal prosecutors brought criminal charges against Josef Beck which alleged that he managed numerous unreported Swiss bank accounts. (Kraemer Decl. Ex. H Part 2. Bates No. US00780-US00789.) However, Mr. Schik

did not intentionally use the Becks' services for the purpose of avoiding his U.S. reporting obligations. Rather, Mr. Schik considered the Becks financial advisors who could be trusted in light of the fact that many other U.S. taxpayers had placed their trust in them for many years. (Schik Affidavit ¶ 18.) The mere fact that the government has brought unproven charges against Mr. Beck should not have adverse implications for Mr. Schik.

### C. The UBS Bank Records

The government has cherry-picked particular Swiss bank account records where someone checked a box to indicate that Mr. Schik did not want his money to be invested in U.S. securities, and that he wanted to open a "numbered account" rather than a "name account." However, there is no evidence that Mr. Schik actually knew what the boxes meant or that the boxes were checked in order to conceal anything. Mr. Schik did not, as the government asserts (without support), tell the banks not to take any action that might reveal the existence of the Swiss accounts. (Schik Affidavit ¶ 20.)

## III. THE PREPARATION OF WALTER SCHIK'S TAX RETURNS

Mr. Schik's 2007 tax returns were prepared by a qualified certified public accountant (CPA), Kenneth Laufer. (Schik Affidavit ¶ 21; Rule 56.1 Counter-Statement ¶ 66.) At all times, Mr. Schik provided Mr. Laufer with all of the documentation that he requested in order to prepare Mr. Schik's tax returns. (Schik Affidavit ¶ 22.) Mr. Schik was never asked to complete a tax planner or questionnaire prior to the preparation of his tax returns. (Kraemer Decl. Ex. J. ("Laufer Depo.") 19:6-12; 26:5-10.; Rule 56.1 Counter-Statement ¶ 66.) Mr. Laufer never asked Mr. Schik if he had any foreign financial accounts or if he earned any income overseas. (Laufer Depo. 27:21-24; 29:12-16; 34:22-35:5; Kraemer Decl. Ex. H Part 1. Bates No. US00146.) When preparing Mr. Schik's tax returns, Mr. Laufer asked Mr. Schik to provide him with all of the tax forms that he received for that particular tax year, which Mr. Schik always provided to him.

(Laufer Depo. 34:9-17.) Mr. Schik never received any tax forms for his foreign bank accounts. At all relevant times, Mr. Schik had no clue about the FBAR filing requirement and the fact that the United States taxes its citizens on their worldwide income. (Schik Affidavit ¶ 21.)

Like the vast majority of American taxpayers, Mr. Schik did not closely review his tax returns. And even if he had, he would not have understood what he was reviewing. (Schik Affidavit ¶ 23.) Mr. Schik never studied U.S. law, tax law, or accounting and never received any formal education in English; as noted above, he has a mere elementary-level education. For these reasons, Mr. Schik did not prepare his own tax returns. Instead, Mr. Schik relied on the expertise of his CPA, Mr. Laufer. As soon as Mr. Schik learned that he might have a problem with regard to his ownership of foreign bank accounts, he conferred with Mr. Laufer who, in turn, referred him to tax counsel, who thereafter advised him to apply to the IRS's OVDP, which, as noted above, inexplicably rejected his application. (Kraemer Decl. Ex. H Part 2. Bates No. US00661; Schik Affidavit ¶ 24.) Had the IRS allowed him to participate in the OVDP, Mr. Schik would have simply joined *tens of thousands* of similar taxpayers who participated in the program and were assessed vastly smaller penalties. (Fink Decl. Ex. C.) Instead, Mr. Schik finds himself hauled before this Court, where the government now argues that he *willfully* failed to report his interest in foreign bank accounts *as a matter of law, not fact*. In other words, as the government would have it, Mr. Schik's mental state and intent – as based on his hellish experience during World War II – just does not matter.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A dispute over a material fact is "genuine" if there is enough evidence for

a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris,* 550 U.S. 372, 380 (2007). When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 256 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59 (1970) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). The government has not met this burden in this case.

## II. STANDARD OF REVIEW

The government argues that preponderance of the evidence is the applicable standard in this case on the issue of whether Mr. Schik's non-reporting was willful. *See* Pl.'s Mem. Supp. Summ. J. 10. The government is wrong and ignores the IRS's own guidance on this issue. Specifically, the IRS's Office of Chief Counsel for the Internal Revenue Service issued a 2006 memorandum regarding "the proper interpretation of the willful standard." *See* I.R.S. C.C.A. 2006-03-026 (Jan. 20, 2006). This IRS memo clearly states: "[w]e expect that a court will find the burden in civil FBAR cases to be that of providing 'clear and convincing evidence [of willfulness],' rather than merely a 'preponderance of the evidence.'" *Id*. "Clear and convincing" is the burden in civil tax fraud cases which, like FBAR cases, involve proof of intent and fraud-like allegations. *See Valetti v. Commission of Internal Revenue*, 260 F.2d 185, 188 (3d Cir. 1958). In fact, in assessing what type of evidence would help to establish a willful FBAR violation, the Internal Revenue Manual (IRM) identifies "[a]ny documents that would support fraud." IRM 4.26.16.5.5.2(3)(f) (June 24, 2021). Even though the IRS memorandum is not binding, it, combined with the IRM, is clear and strong evidence showing how the IRS intended the term "willful" to be interpreted by the courts. Thus, this Court should apply the clear and

convincing evidence standard in deciding whether Mr. Schik willfully failed to file information reports about his foreign accounts to the Treasury Department.

## III. THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER OR NOT WALTER SCHIK'S FAILURE TO FILE THE FBAR WAS WILLFUL

### A. Willfulness is Defined as the Intentional Disregard of a Known Legal Duty and Should Not Include Recklessness

Although some courts have recently found that a "reckless" standard is applicable in the FBAR context, these findings, which attach "reckless conduct" to the "willfulness" standard, are contrary to decades of Supreme Court precedent and, as explained above, *even the IRS's own prior interpretation* of the willfulness standard. In interpreting the term willful – in both the tax context and in the context of other provisions of the Bank Secrecy Act (where the FBAR rules are found) – the Supreme Court has defined willfulness as an intentional violation of a known legal duty. *See United States v. Pomponio*, 429 U.S. 10 (1976); *Ratzlaf v. United States*, 510 U.S. 135 (1994). A showing that the defendant acted with "careless disregard" is simply not adequate to establish willful FBAR liability. *Pomponio*, 429 U.S. at 12; *see also United States v. Flume*, No. 16-CV-73, 2018 WL 4378161 (S.D. Tex. Aug. 22, 2018).

If the government's reckless standard is correct (and it is not), *any* taxpayer that has signed a tax return would be deemed to have knowledge of the question at the very bottom of Schedule B regarding foreign bank accounts. *See Flume*, 2018 WL 4378161 at *7 ("If every taxpayer, merely by signing a tax return, is presumed to know of the need to file an FBAR, it is difficult to conceive of how a violation could be non[-]willful." (citations and quotation marks omitted).) This logic, however, glosses over the fact that the failure to notice a single question on a schedule annexed to a tax return (which by itself is often far too complex for many taxpayers to decipher), is, at most, simple negligence or carelessness and cannot form the basis for finding a willful violation. *See, e.g., United States v. de Forrest*, 463 F.Supp.3d 1150 (D.

Nev. 2020) (holding that there were genuine disputes as to material facts that precluded summary judgment on the issue of willfulness despite the taxpayer's submission of an erroneous signed tax return); *United States v. Clemons*, No. 18-CV-258, 2019 WL 7482218 (M.D. Fla. Oct. 9, 2019) (holding that the possibility that a § 5314 violation was merely negligent precluded summary judgment on the issue of willfulness). A finding of willful blindness must be supported by evidence showing that the individual *was aware* of some obligation, but failed to follow up on the obligation, and not simply on some unproven presumption that an individual read and understood every detail of his or her tax return. In *Cheek v. United States*, 498 U.S. 192, 201 (1991) the Supreme Court explained that the complexity of tax laws rendered doctrines that hold that ignorance of the law or a mistake is no defense to prosecution cannot apply in tax cases. *See also Ratzlaf v. United States*, 510 U.S. 135 (1994) (holding that to sustain a criminal conviction for structuring the government must prove defendant acted with knowledge of an anti-structuring provision). Accordingly, in order to sustain the willful penalty, the government must prove that Mr. Schik intentionally violated a known legal duty in order to satisfy the element of willfulness. Proof of reckless conduct is insufficient.

The government's reliance on *Lefcourt v. United States*, 125 F.3d 79, 83 (2d 1997), is misplaced. *Lefcourt* did not explicitly hold that willfulness includes recklessness; rather, *Lefcourt* was about the definition of "intentional disregard" in the context of a law firm's failure to provide its client's name on IRS Form 8300. *Lefcourt*, 125 F.3d at 82. In *Lefcourt*, unlike the case at hand, it was uncontested that the law firm was aware of its requirement to file a Form 8300, that the form asked for its client's identity, and that the firm nonetheless chose to refuse to provide the name. *Id.* at 83. The facts and circumstances of Mr. Schik's case are not akin to those in *Lefcourt.*

*Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007), cited by the government, held in the context of the Fair Credit Reporting Act, that a willful failure covers reckless conduct. *Safeco* should not be extended to FBAR cases. We recognize that decisions from courts in other Circuits have held otherwise, but those distinguishable cases are not binding on this Court. *See* Pl.'s Mem. Supp. Summ. J. at 14. In short: in this case the Court should apply the "intentional disregard" standard for willfulness described above and find that there are genuine issues of material fact regarding whether or not Mr. Schik willfully failed to file FBARs.

**B. Even Applying the "Reckless Disregard" Definition of Willfulness, There is Still a Genuine Issue Regarding Whether or Not Walter Schik was Willful**

Even applying the reckless disregard standard (as opposed to the intentional disregard standard) there is still dispute regarding whether Mr. Schik acted willfully in failing to report his foreign accounts in 2007 because the very facts relied upon by the government are hotly contested by the parties. Where the government sees evidence of willfulness, the defense submits that, if anything the facts establish merely that Mr. Schik's actions were "accidental or unconscious" rather than "voluntary." *See United States v. McBride*, 908 F. Supp. 2d 1186, 1205 (D. Utah 2012). Further, there are no facts that establish that Mr. Schik deliberately shielded himself from information that might have advised him that he had an obligation to annually submit FBARs to the Treasury Department's FBAR office in Detroit, Michigan, and his mere (and common) failure to review his tax returns should not be enough to establish willfulness as a matter of law in this case. Mr. Schik hired a CPA to ensure his tax compliance and gave his CPA all of the information that he requested. *See Flume*, 2018 WL 4378161, at *9 (wherein the court held that because the defendant hired a tax-return preparer upon who's competence the defendant relied in preparing his tax return, it was arguably not reckless for the defendant not to "bother" reading the FBAR instructions.) The records in this case plainly demonstrates that

there is a genuine issue as to whether or not Mr. Schik was willful and that only a jury can answer this question.

The facts and circumstances here clearly distinguish this case from *Williams*, *McBride* and *Gentges* cited in the government's brief. Specifically:

- Mr. Schik was born and grew up overseas before immigrating to the U.S. after experiencing the horrors of the Holocaust.

- Mr. Schik believed that it was important for people who had suffered persecution and who had been forced to flee their homelands to escape violence to ensure that their funds were kept in a foreign country so that they could be accessed in the event of another catastrophe. This was Mr. Schik's sole intent when he established foreign accounts; there was no intent to evade U.S. tax or reporting obligations.

- The source of all of the money in Mr. Schik's foreign bank accounts was inheritance that he received from relatives in Europe; Mr. Schik was not moving money abroad from the U.S. to conceal U.S.-source income.

- Mr. Schik did not withdraw money from the UBS accounts; he considered the accounts a safety-net after suffering the horrors of the Holocaust, and he therefore did not make use of the accounts.[1]

- After the accounts were opened, Mr. Schik relinquished all control over the accounts to Mr. Beck and he did not participate in investment decisions and did not have any understanding about how Mr. Beck structured the accounts.

- Mr. Schik – who lacks almost any formal education – also had no knowledge concerning the offshore asset reporting requirements of U.S. taxpayers.

- Mr. Schik's accountant during the relevant time period did not advise him concerning foreign accounts, Mr. Schik did not believe that it was necessary to discuss non-U.S.-based accounts with his accountant, and Mr. Schik's accountant never asked him to complete a tax organizer.

- As soon as Mr. Schik became aware of his reporting obligations, he applied to the OVDP and, even after he was inexplicably rejected from the OVDP, he proceeded to file amended tax returns and pay back tax and interest on the income from his foreign accounts.

[1] Any withdrawals from Mr. Schik's UBS accounts were at the sole direction of the Becks; Mr. Schik did not receive any funds from the accounts until they were closed and the money was patriated to the United States.

- Mr. Schik did not plead guilty to criminal tax fraud.

Furthermore, the government's argument that Mr. Schik's "recklessness is underscored by the large amount of funds in his UBS accounts" is misplaced. *See* Pl.'s Mem. Supp. Summ. J. 14. Though the accounts admittedly held a large corpus balance, the net additional income from Mr. Schik's foreign accounts was less than four percent of Mr. Schik's total adjusted gross income for tax year 2007. In fact, at all times, Mr. Schik *was* paying taxes on the earnings on his UBS accounts; foreign taxes were always withheld from Mr. Schik's UBS accounts if they were due. After factoring in those foreign taxes (for which U.S. taxpayers are entitled to a foreign tax credit) as well as other expenses, *Mr. Schik was actually owed a substantial refund from the IRS after amending his 2007 income tax return to include his foreign bank accounts.*

Also contrary to the government's contention, Mr. Schik has never claimed that he forgot about the UBS accounts at issue. *See* Pl.'s Mem. Supp. Summ. J. 14. Mr. Schik was simply (and understandably) unaware that he was required to report his foreign bank accounts, which held funds that had no association with the United States—funds that he inherited from his relatives *in Europe* after they perished in the Holocaust—on an FBAR. Because Mr. Schik was unaware of his FBAR filing requirement, as well as the fact that his foreign accounts were subject to U.S. taxation, he understandably did not bring those accounts to his accountant's attention. Had Mr. Schik's accountant, Mr. Laufer, simply asked Mr. Schik for bank records relating to any foreign bank accounts that he owned, Mr. Schik would have secured those records and provided them to Mr. Laufer, as he did for every item that Mr. Laufer asked him for in connection with his tax returns.

As demonstrated above, the facts and circumstances of Mr. Schik's case are far different from those at issue in the cases cited by the government (*Williams*, *McBride*, and *Gentges*). As

such, whether Mr. Schik was willful is a question of fact for a jury. *See Williams*, 489 F. App'x at 658; *Flume*, 2018 WL 4378161 at *7 (holding that in light of defendant's testimony that he did not know about the FBAR requirements until 2010, it "is the factfinder's role, not the [c]ourt's at summary judgment, to decide which of the two sworn statements carries more weight."); *United States v. House*, 524 F.2d 1035, 1045 (3d Cir. 1975) ("The question of willfulness is uniquely for the trier of fact."). Here, there are critical facts for a jury to determine concerning Mr. Schik's willfulness or non-willfulness. As such, summary judgment is not warranted.

## IV. THE IRS VIOLATED THE APA IN DETERMINING THE AMOUNTS OF PENALTIES

Under 31 U.S.C. § 5321, the maximum civil penalty assessed against a defendant who willfully violates the FBAR filing requirement "shall be increased" to either (i) $100,000 or (ii) 50 percent of the "balance in the [defendant's foreign] account at the time of the violation[,]" whichever amount is greater. *See* 31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii). Under the Internal Revenue Manual, "[t]he date of a violation for failure to timely file an FBAR is the end of the day on June 30th of the year following the calendar year for which the accounts are being reported[,]" and thus, "[t]he balance in the account at the close of June 30th is the amount to use in calculating the filing violation." IRM 4.26.16.6.5. Here, because the IRS did not have the balance information as of June 30, 2008, it decided to calculate the penalty based on the accounts' balances as of December 31, 2007. (Fink Decl. Ex. D.) However, the penalty amount assessed does not correspond to the accounts' balances as of December 31, 2007. Accordingly, the amount of the penalty is clearly arbitrary and capricious; in fact, even the government cannot now discern how the penalty was computed. *See* Pl.'s Mem. Supp. Summ. J. 14. If the computation of the FBAR was a mere error in calculation, the IRS was given numerous opportunities in the past to correct that error. (Fink Decl. Ex. E.; Fink Decl. Ex. F.) Any

recalculation and ensuing re-assessment at this point in time would violate the statute of limitations. The IRS may not now recalculate and reassess its penalty against Mr. Schik because any such assessment would be time-barred.

## V. THE PROPOSED 50% FBAR PENALTY VIOLATES THE EIGHTH AMENDMENT OF THE U.S. CONSTITUTION

The Eighth Amendment of the U.S. Constitution provides that the government cannot impose "excessive fines." U.S. CONST. AMEND. VIII. The IRS has assessed a 50% willful FBAR penalty amounting to nearly $9 million dollars. We submit that, even if, arguendo, Mr. Schik did act willfully when he failed to file an FBAR for the 2007 tax year – he did not – the penalty assessed by the IRS violates the Eighth Amendment's prohibition of excessive fines.

Simply put, the Eighth Amendment precludes the government from imposing fines that are grossly disproportional to a taxpayer's alleged misconduct. *See, e.g.*, *United States v. Bajakajian*, 524 U.S. 321 (1998). Here, requiring Mr. Schik to pay a penalty of $8,822,806 is patently excessive in light of the fact that all Mr. Schik "failed" to do was file a basic reporting form that he did not know existed, that was not a part of his income tax return, and for which no tax or any other payment obligation was required, especially when considered in light of the fact that, based on the amended return, in 2007 there was no tax due resulting from Mr. Schik's interest in his Swiss account, the very tax year for which the FBAR penalty has been assessed. In fact, the amended tax returns for the period 2003 through 2008 – which Mr. Schik voluntarily filed after he was denied participation in the OVDP – reflected *no additional federal tax due* as a result of his interest in the Swiss account. Yet, somehow, the government has deemed it appropriate to impose a penalty of nearly $9 million dollars to punish Mr. Schik for not reporting his Swiss accounts.

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment should be denied.

September 22, 2021

KOSTELANETZ & FINK, LLP

By: /s/ Robert S. Fink
Robert S. Fink
Juliet L. Fink
KOSTELANETZ & FINK, LLP
Seven World Trade Center, 34th Floor
New York, NY 10007
(212) 808-8100 (phone)
(212) 808-8108 (fax)
Email: jfink@kflaw.com
*Attorneys for Defendant Walter Schik*